# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case No. 1:23-cr-292-08 (CKK)** |
| | : | |
| **v.** | : | |
| | : | |
| **BILLY HARVEY,** | : | |
| | : | |
| **Defendant.** | : | |

## UNITED STATES' MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing as to Defendant Billy Harvey (hereafter, the "Defendant").[1]

On April 4, 2025, the Defendant plead guilty, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), to a single count of Kidnapping and Aiding and Abetting, in violation of 18 U.S.C. §§ 1201(a)(1) and 2. *See* ECF No. 136. For the reasons set forth below, the United States respectfully requests that the Court accept the parties' agreement and impose a sentence of 188 months of incarceration, followed by 60 months of supervised release.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

On June 9, 2023, at approximately 3:43 a.m., on the 4400 block of F Street SE, Washington, D.C.,[2] the Defendant and nine coconspirators committed an armed kidnapping and carjacking of two victims—decedent DeAngelo Beale and surviving victim Lorenzo Hall. Just hours before, the codefendants and victims were celebrating the birthday of a well-known neighborhood figure.

---

[1] Sentencing is scheduled for July 30, 2025.

[2] Law enforcement knows this area as part of "Simple City" territory. Simple City is a Washington, D.C.-based crew that gained notoriety in the 1990s and early 2000s for crew-related activity and violence. *See, e.g.*, Doug Struck, *In D.C.'s Simple City, Complex Rules of Life and Death*, Washington Post (Apr. 19, 1997), https://www.washingtonpost.com/archive/politics/1997/04/20/in-dcs-simple-city-complex-rules-of-life-and-death/f0054134-49a1-42c2-83ca-58076a932f73/.

The celebrations commenced in the 4400 block of F Street, relocated to the Saint Yves nightclub in Washington, D.C., and ultimately returned to the 4400 block of F Street SE in the early morning hours of June 9, 2023.

Around 2:29 a.m., the Defendant arrived on the block in a silver SUV. By that point, several of his coconspirators had returned from the club, although the victims had not. At 2:33 a.m., codefendants Ramel Henderson ("Henderson"), Delonte Mundaray ("Mundaray"), Marquette Jackson, and Marquise Jackson broke into Mr. Beale's black Mercedes SUV while it was unoccupied and parallel parked on the block. After rummaging inside for several minutes, they took some bags from the Mercedes SUV.

Around 3:02 a.m., the victims and remaining codefendants returned to the 4400 block of F Street SE to enjoy the block party in the courtyard and surrounding area. Around 3:43 a.m., the victims approached Mr. Beale's Mercedes SUV, preparing to leave the party. At that point, the Defendant, his codefendants, Juvenile-1, and Marquise Jackson ambushed the victims, abruptly transforming the celebrations into a deadly nightmare.

First, Marquise Jackson approached the victims near the Mercedes SUV, exchanged handshakes, and appeared to say goodbye. Meanwhile, Evans, Kevon Jackson (hereafter, "K. Jackson"), Juvenile-1, and Marquette Jackson advanced, surrounding Mr. Beale's vehicle before attacking Mr. Beale while he was in the driver's seat. Codefendant Malik Terrell ("Terrell") joined the onslaught, too.

The Defendant and Mundaray ran towards the fray. The Defendant drew a firearm and assumed a shooting stance, aiming his firearm squarely at Mr. Hall as Mundaray and Juvenile-1 searched and stripped Mr. Hall of his clothing.



**Figure A:  Screenshot from Surveillance from the 4400 block of F Street SE, depicting the Defendant (encircled in red) holding Mr. Hall at gunpoint**

Mundaray then pushed Mr. Hall towards the passenger-side of the Mercedes SUV, and ultimately, to the rear of the Mercedes SUV.

Around 3:45 a.m., the codefendants ripped Mr. Beale from the driver's seat, prevented him from fleeing, and pushed him into the rear of the Mercedes SUV.  For the Defendant's part, while making his way towards the rear of Mr. Beale's Mercedes SUV, the Defendant picked from the ground the victims' shoes and clothing that had been forcibly removed.  The Defendant watched as his codefendants confined the victims within the rear of the Mercedes SUV.  The Defendant then resumed picking up the victims' clothing from the street, ensuring no spoils were left behind. Around 3:46 a.m., the Defendant and Evans appeared to survey the clothing the Defendant had collected, taking inventory of their loot thus far.  Unfortunately, their greed was not yet satiated.

Mundaray assumed the driver's seat of Mr. Beale's Mercedes SUV.  Codefendant Melvin Green ("Green") retrieved a firearm from Mundaray, removing it from the vicinity.  Henderson, Evans, Juvenile-1, and Marquise Jackson also entered the Mercedes SUV, which fled the scene

with the victims confined therein.   Around the same time, the Defendant and his other codefendants—Terrell, K. Jackson, and Marquette Jackson—also fled the scene in a nearby parked white Nissan Altima.

The Defendant and his coconspirators initially brought the victims to a wooded area nearby (the exact location is unknown) in the District of Columbia, not far from where the kidnapping and carjacking began.   There, the defendants assaulted the victims, including with firearms, and demanded from Mr. Beale his addresses where he stored marijuana, jewelry, U.S. currency, and other valuables.   Horrifyingly, the Defendant filmed a short cellphone video of himself in the woods, threatening Mr. Hall with a firearm as Mr. Hall appeared unclothed on the ground.[3]   The codefendants then traveled in the Mercedes SUV and Nissan Altima to Suitland, Maryland, where they committed two armed home invasions of Mr. Beale's residences.

At 4:39 a.m., the Mercedes SUV and the white Nissan Altima entered an apartment complex in Suitland, Maryland, where Mr. Beale maintained an apartment believed to be used as a stash location for marijuana distribution. At least five codefendants—including Evans, Marquise Jackson, Marquette Jackson, and Terrell—exited the vehicles and burgled Mr. Beale's apartment as Mr. Beale remained captive in the Mercedes SUV.   Afterwards, both the Mercedes SUV and the Nissan Altima left the property in tandem.

Approximately one hour later, at 5:39 a.m., Mr. Beale's Mercedes SUV arrived in the parking lot outside Mr. Beale's apartment building in Waldorf, Maryland.   Inside the Mercedes SUV were Mr. Beale (still held captive), Evans, Henderson, K. Jackson, Marquise Jackson, and Juvenile-1.   The car parked directly in front of the entrance to Mr. Beale's apartment building. Victim-3, who lived with Mr. Beale in the residence, was asleep at the time.   Evans, Henderson,

---

[3] The evidence suggests that, prior to the coconspirators traveling to Mr. Beale's Maryland residence, Mr. Hall was left behind in the District of Columbia.

and K. Jackson committed an armed home invasion, robbing Victim-3 at gunpoint and burglarizing the residence as Marquise Jackson and Juvenile-1 detained Mr. Beale in his vehicle outside.

At 5:43 a.m., while the home invasion was ongoing, Mr. Beale attempted an escape. He jumped from his Mercedes SUV, where he had been held captive, drew a pistol, and fired shots into the vehicle towards his captors, striking Marquise Jackson in the front passenger seat. Moments later, Evans and K. Jackson exited Mr. Beale's apartment and fired numerous shots at Mr. Beale from the apartment entrance, striking Mr. Beale multiple times.

At 5:45 a.m., the Charles County, Maryland, Sheriff's Office ("CCSO") responded to the shooting scene outside Mr. Beale's apartment complex in Waldorf, Maryland. There, law enforcement discovered Mr. Beale deceased in the parking lot with multiple gunshot wounds.

Approximately 15 minutes after the shooting, at 6:01 a.m., Evans, Henderson, K. Jackson, and Juvenile-1 arrived in Mr. Beale's Mercedes SUV outside the Emergency Room entrance to Southern Maryland Hospital in Clinton, Maryland. There, they pulled Marquise Jackson from the front passenger seat of the vehicle and left him to die at the hospital.

At 6:55 a.m., firefighters found Mr. Beale's Mercedes SUV fully engulfed in flames on the side of a road in Capitol Heights, Maryland. The vehicle appeared to have been burned using an accelerant. Approximately ten minutes prior, surveillance footage at an adjacent intersection shows the white Nissan Altima, referenced *supra*, making a U-turn, consistent with having been used to facilitate burning Mr. Beale's vehicle and escaping.

Lastly, at approximately 8:02 a.m., the District of Columbia Metropolitan Police Department ("MPD") responded to the 4000 block of C Street SE, Washington, D.C., not far from where the offenses began. There, the officers found Mr. Hall standing outside, naked except for one sock. Officers observed multiple lacerations across Mr. Hall's body and blood on his face.

On August 25, 2023, seven codefendants were indicted for multiple non-capital offenses related to the June 9, 2023 armed kidnapping and carjacking of Messrs. Beale and Hall in the District of Columbia and Maryland. On November 3, 2023, the First Superseding Indictment [ECF No. 43] was returned, *inter alia*, adding the Defendant to the kidnapping, carjacking, and associated firearm-related charges. On May 13, 2024, the Second Superseding Indictment [ECF No. 103] was returned, adding capital offenses against some of the codefendants involved in Mr. Beale's homicide in Waldorf, Maryland. Within the Second Superseding Indictment, the Defendant was charged as follows:

- Count 2: Kidnapping and Aiding and Abetting of Mr. Beale, in violation of 18 U.S.C. §§ 1201(a)(1) and 2;

- Count 3: Kidnapping and Aiding and Abetting of Mr. Hall;

- Count 5: Carjacking and Aiding and Abetting of Mr. Beale's Mercedes SUV, in violation of 18 U.S.C. §§ 2119(1) and 2.

- Count 8: Brandishing a Firearm in Furtherance of a Crime of Violence and Aiding and Abetting, in violation of 18 U.S.C. § 924(c)(1)(A)(ii); and

- Count 10: Unlawful Possession of a Firearm, in violation of 18 U.S.C. § 922(g).

On April 4, 2025, the Defendant plead guilty to Count 2 of the Second Superseding Indictment, admitting to his integral role in the June 9, 2023 kidnapping of Mr. Beale. *See* ECF No. 135, 136.

## II.  LEGAL STANDARD

Pursuant to 18 U.S.C. § 3553(a), the Court shall impose a sentence that is sufficient, but not greater than necessary, to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" "to afford adequate deterrence to criminal

conduct;" "to protect the public from further crimes of the defendant;" and to "provide the defendant with needed educational or vocational training." 18 U.S.C. § 3553(a)(2). In addition, the Court must also consider "the nature and circumstances of the offense and the history and characteristics of the defendant;" the types of sentences available, the Sentencing Guidelines; any pertinent policy statements; the need to avoid unwarranted sentence disparities; and the need to provide restitution to any victims. *Id.* § 3553(a).

The listed factors in 18 U.S.C. § 3553(a) include the following:

1) The nature and circumstances of the offense and the history and characteristics of the defendant;

2) The need for the sentence imposed –
    a) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    b) To afford adequate deterrence to criminal conduct;
    c) To protect the public from further crimes of the defendant; and
    d) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3) The kinds of sentences available;

4) The kinds of sentence and the sentencing range established for –
    a) The applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
        i) Issued by the Sentencing Commission . . . ; and
        ii) That . . . are in effect on the date the defendant is sentenced

5) Any pertinent policy statement –
    a) Issued by the Sentencing Commission . . . and
    b) That . . . is in effect on the date the defendant is sentenced

6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

7) The need to provide restitution to any victims of the offense.

Procedurally, after calculating the applicable Guidelines range, the Court should next consider all the applicable factors set forth in 18 U.S.C. § 3553(a). Indeed, the Guidelines

themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *Rita v. United States*, 127 S. Ct. 2456, 2463 (2007).

## III.    GUIDELINES CALCULATION

### A.    Total Offense Level

The base offense level for a violation of 18 U.S.C. §§ 1201(a)(1) and 2 is governed by U.S.S.G. § 2A4.1. As detailed in the Final Presentence Report (the "PSR") [ECF No. 154] and the plea agreement [ECF No. 136], the offense level for Count 2 is 32, pursuant to U.S.S.G. § 2A4.1(a). Pursuant to U.S.S.G. § 2A4.1(b)(2)(B), a two-level enhancement applies because Mr. Beale sustained serious bodily injury. Further, under U.S.S.G. § 2A4.1(b)(3), an additional two-level enhancement applies because a dangerous weapon—to wit, a firearm—was used. After adjustments for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a) and (b), the final offense level for Count 2 is 33.

### B.    Criminal History Category

The PSR writer calculates the Defendant to have three criminal history points, which places him in Criminal History Category II. *See* PSR ¶ 73.

### C.    Sentencing Guideline Range

For Count 2, a final offense level of 33 and Criminal History Category II results in a guidelines range of 151 to 188 months of incarceration, two to five years of supervised release, and a fine range of $35,000 to $350,000. *See* U.S.S.G. §§ 5D1.2(a)(2) and 5E1.2(c)(3).

## IV.    ARGUMENT

As stated above, the United States respectfully requests the Court accept the parties' Rule 11(c)(1)(C) agreement and sentence the Defendant thereunder to a term of 188 months'

incarceration, followed by 60 months of supervised release. The United States respectfully submits that a sentence of 188 months is sufficient, but not greater than necessary, to serve the interests of justice and appropriately balances the sentencing factors under 18 U.S.C. § 3553(a).

### 1.    The Nature, Circumstances, and Seriousness of the Offense

The Defendant's involvement in the June 9, 2023 armed kidnapping and carjacking occurred within the context of a broader, calculated scheme to ransack and rob the victims with no regard for the value of human life. The Defendant callously wielded his own firearm while his coconspirators descended upon the victims, picking them apart and manhandling them into the rear of the Mercedes SUV. And as the victims were cruelly stripped and shoved into the Mercedes, somehow, the Defendant's primary focus was on collecting their valuables.

Inevitably, the Defendant and his coconspirators' concerted effort to inflict violence using firearms resulted in the irreversible loss of life, which Mr. Beale's devoted family and Mr. Hall will shoulder well after the Defendant has finished serving his sentence in this matter. While true that the United States cannot assert the Defendant was among the individuals involved in the armed home invasions of Mr. Beale's Maryland residences, undeniably, the Defendant was an integral part of the initial kidnapping and carjacking on F Street, which ultimately culminated in Mr. Beale's and Marquise Jackson's deaths. In short, the gravity of the offense the Defendant and his coconspirators committed on June 9, 2023, cannot be understated, and the parties' recommended sentence at the high end of his guidelines range reflects as much.

### 2.    The Defendant's History and Characteristics

The United States appreciates that the Defendant's childhood was marred by instability and scarcity, which may have contributed to the Defendant's present circumstances. *See* PSR ¶¶ 88-90, 93. Yet, the Defendant's criminal history suggests that, instead of becoming deterred, his

criminal conduct only escalated. As reflected in Paragraph 17 of the Defendant's PSR, he previously plead guilty in D.C. Superior Court to Attempt to Commit Robbery and Possession of a Prohibited Weapon-BB Gun, involving similar, albeit relatively less severe, conduct. Specifically, on January 1, 2013, in concert with others, the Defendant followed the victim and pointed an apparent firearm at the victim while commanding the victim to turn over his property.

Despite receiving the benefit of a sentence under the Youth Rehabilitation Act ("YRA") in that matter, the Defendant incurred numerous violations of conditions, ultimately prompting the parole commission to revoke his supervised release; the Defendant faced an additional eight months' incarceration. Subsequently, the Defendant accumulated several additional arrests, none of which resulted in convictions. Ultimately, the United States' objective in its sentencing recommendation is to prevent the continued escalation of criminal conduct destructive to both the community and the Defendant.

### 3.    The Need to Promote Respect for the Law and Deterrence

The sentence should reflect the seriousness of the offense, promote respect for the law, afford adequate deterrence, and provide just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2). The United States respectfully submits there is a significant need to deter the calculated and violent conduct in this case, both for this Defendant and for others. It is important for both the Defendant and others in the community to appreciate that, in the end, engaging in crime and violence does not pay, that their actions have consequences, and that the severity of those consequences render such schemes unworthwhile. Given this Defendant's criminal history and his concerning conduct, the message of deterrence is especially important. As a result, the United States respectfully submits that, under these facts, a significant term of imprisonment and a sentence within the applicable guidelines range is both appropriate and necessary.

A prison sentence of 188 months is the best measure of deterrence available to the Court. Such a sentence accomplishes the aims of § 3553(a)(2) in both a general and particularized manner. Such a sentence would reflect both the seriousness and dangerousness of the Defendant's conduct in this case, and also promote respect for the law and the safety of the community by serving as a deterrent to senselessly violent conduct such as that perpetrated by the Defendant and his coconspirators.

### 4.    Other Factors

The United States' recommended sentence is justified to protect the public from the Defendant. Moreover, it would give the Defendant ample time to pursue further educational and vocational training and participate in other programs—such as counseling, substance abuse treatment, and classes to earn his GED—which will hopefully redirect him from the path he is on. The recommended sentence also appropriately reflects that the Defendant's encounters with the criminal justice system have, to date, not adequately deterred him from engaging in the conduct to which he ultimately pleaded guilty in the present case.

## V.    CONCLUSION

For the foregoing reasons, the United States recommends that the Court sentence the Defendant to an aggregate sentence of 188 months of imprisonment, followed by a term of 60 months of supervised release. Such a sentence serves the interests of justice and appropriately balances the sentencing factors articulated under 18 U.S.C. § 3553(a).

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:    /s/ Sitara Witanachchi
SITARA WITANACHCHI
D.C. Bar No. 1023007
THOMAS G. STRONG

11

N.Y. Bar No. 4958658
Assistant United States Attorneys
U.S. Attorney's Office
Violent Crime and Narcotics Trafficking Offenses
601 D Street, NW
Washington, D.C. 20530

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2025, a copy of the United States' Sentencing Memorandum was submitted via CM/ECF, which will transmit to counsel to the Defendant.

/s/ Sitara Witanachchi
Assistant U.S. Attorney